J-S19032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: B.V. | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>: |
| APPEAL OF: J.M.-B., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 252 WDA 2021 |

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s): No. 253 OC 2020

| | |
|---|---|
| IN RE: J.V. | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>: |
| APPEAL OF: J.M.-B., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 253 WDA 2021 |

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s): No. 254 OC 2020

| | |
|---|---|
| IN RE: J.V. | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>: |
| APPEAL OF: J.M.-B., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 254 WDA 2021 |

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s): No. 255 OC 2020

| | |
|---|---|
| IN RE: B.V. | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA |

J-S19032-21

APPEAL OF: J.M.-B., MOTHER

:
:
:
:
:
:
:
:
:
:    No. 255 WDA 2021

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  No. 256 OC 2020

BEFORE:  DUBOW, J., MURRAY, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:                    **FILED:  July 1, 2021**

J.M.-B. (Mother) appeals from the January 26, 2021 orders of the Court

of Common Pleas of Clarion County (trial court) terminating her parental rights

to Be.V. (age 10), Ju.V. (age 6), Jo.V. (age 4) and Bn.V. (age 3) (collectively,

Children).[1]  We affirm.

**I.**

We glean the facts of this matter from the transcript of the goal change

hearing held on October 20, 2020, and the transcript of the termination

hearing held on January 19, 2021.  Following multiple dependency cases in

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Mother filed a separate notice of appeal at each docket number in the trial
court and we consolidated her appeals *sua sponte*.  **See** Pa.R.A.P. 513.  The
trial court also terminated the parental rights of J.V. (Father) at the conclusion
of the hearing.  We address Father's appeal separately at docket numbers
215-218 WDA 2021.

- 2 -

Armstrong and Clarion counties from 2009 onward, Clarion County Children and Youth Services (CYS)[2] took emergency physical custody of Children in July 2019. They have remained in foster care ever since.

**A.**

The first witness at the goal change hearing was Jackie Peters (Peters), a supervisor at the Armstrong County Children, Youth and Family Services (Armstrong CYF). Peters testified that Armstrong CYF had been consistently involved with the family from 2009 until 2019 and had received 28 referrals related to the family over that time. Armstrong CYF filed for dependency for Children in 2009, 2015, 2017 and 2018. Peters testified that the family had issues with housing, domestic violence between Mother and Father, instability in their relationship and Mother's mental health. Armstrong CYF had offered in-home services for the family from multiple providers as well as counseling services for two of the Children, mental health services for Mother and anger management services for Father. In 2018, they increased the in-home services from 18 hours per week to 23 hours per week. Families usually receive no more than 10 hours of services per week.

Peters testified that in January 2017, Father slapped Be.V. and threatened her with a belt, prompting Mother to obtain a temporary PFA

---

[2] CYS, legal counsel for Children and Children's guardian *ad litem* (collectively, Appellees) filed a joint brief in these appeals.

against him. Mother reported Father for domestic violence and sought temporary PFAs on multiple occasions. At one point that year, Mother and Father voluntarily placed Children with a family in Clarion County. They left Children with limited clothing and supplies and Be.V. and Jo.V. needed immediate medical treatment. Armstrong CYF received a referral at that time because Mother and Father had not been administering Ju.V.'s seizure medication. Armstrong CYF also learned that cable bills had been opened in Be.V. and Ju.V.'s names.

Father completed an anger management program from February to August 2017. The 2017 dependency case was closed in December but Mother and Father agreed to continue working with services. However, Armstrong CYF received two new referrals related to the family within 20 days of closing the case. Peters testified that Father was an indicated perpetrator of physical abuse as a result of one of the referrals because he struck Jo.V., who was one year old, multiple times causing a nosebleed. They were discharged from in-home services for noncompliance.

Armstrong CYF then resumed in-home services with the family, which included more anger management treatment for Father. Children were adjudicated dependent again in March 2018. The family's housing was unstable and had problems with bedbugs and lice. The in-home services team determined that Mother needed training on basic skills such as showering and cleaning the house. Mother and Father both needed assistance with parenting

skills and supervising Children. Mother did not engage with the services while they were in her home and would use her cell phone and expect them to clean the home for her. Peters testified that Be.V. performed a lot of the parenting tasks for her younger siblings. Despite working with services, Peters said that in mid-2018, the home was full of garbage, dirty dishes, diapers and flies.

In early 2019, Mother and Father had not improved their living conditions and were evicted from their home. They moved in with one of Father's family members in Clarion County. Peters testified that the family had not resolved any of the issues related to housing, instability, anger management and mental health while the case was open in Armstrong County. The case was transferred to CYS after the move.

Judy Myers (Myers), an ongoing supervisor at CYS, testified that in 2015, there were allegations that a babysitter had sexually abused Be.V. and Ju.V. Mother said that she had difficulty believing Be.V.'s allegations because she had never experienced abuse herself from that individual. When a no-contact order was entered for Children, Mother asked if she and Father could continue to have contact with the babysitter without Children present. The babysitter was eventually convicted of crimes related to sexual abuse of Be.V., sentenced to prison and indicated as a perpetrator of sexual abuse. Myers also testified that in 2015, Mother had a romantic relationship with another man who had criminal convictions for sex crimes against a child. Throughout

the pendency of the dependency action, Mother left Children and Father on several occasions for new relationships.

Myers testified that Mother moved back and forth between Armstrong and Clarion counties several times, making it difficult to establish services in either county. In 2017, CYS received reports for medical neglect of Jo.V. and Ju.V. and discovered that Mother had not been administering their prescribed medication. Mother was indicated as a perpetrator of medical abuse and neglect as a result. Soon after, the family returned to Armstrong County.

CYS accepted transfer of the instant dependency case from Armstrong County in March 2019. Children had been adjudicated dependent for approximately one year. When they moved to Clarion County, the family lived with one of Father's relatives in a three-bedroom home with 12 or 13 residents. They shared four twin beds between Mother, Father, Children and three additional children. The house was in poor repair and infested with bedbugs. Children would also sometimes sleep in a van outside.

CYS took emergency custody of Children in July 2019 after Mother took them to Elk County and left them with strangers she had met a few days prior. When Myers retrieved Children, she found that they were dirty and did not have shoes. Ju.V. did not have his medication. On the drive back to Clarion, Be.V. told Myers that she was afraid to go home because Father hits everyone. She said that Mother was always leaving and she was not sure who her real

father was. She did not want to return to Father. Mother was charged with child endangerment based on this incident.

Amanda Gregory (Gregory), an ongoing caseworker at CYS, testified regarding Mother and Father's family service plan goals for reunification with Children. The first goal for both parents was to maintain a safe living environment. Mother had four different residences while Children were in placement and began renting her most recent home in January 2020. When Gregory visited in September 2020, a man was sleeping on the couch. Mother said he would be staying there for a short period of time but did not notify CYS or provide information for a background check as required by her permanency plan. Gregory testified that in the past, Mother had allowed two other individuals who were indicated perpetrators of abuse stay in the home, as well as a man with a criminal history that included indecent exposure. Mother received $783 per month in SSI benefits and shortly before the goal change hearing she obtained a job at Subway. She had otherwise not held a job in five years.

Mother married another man (Husband) during the dependency. Husband was not approved by CYS to be in the home with Children because his own children had been removed by Armstrong CYF and he had a criminal history that included robbery and aggravated assault. He and Father had a physical altercation in the CYS parking lot in front of Children on one occasion. In addition, Husband faced criminal charges after sending nude photographs

of Mother to her former CYS caseworker. At the time of the goal change hearing, Mother was still married but they did not live together.

Mother also had a goal to engage in mental health services during the duration of the dependency case in Clarion County. CYS required her to obtain a blended case manager to help manage all her mental health services and medications but she had not worked with one since January 2020. She did not consistently take her medication for depression and anxiety and did not start counseling until one month prior to the goal change hearing.

Mother and Father both had a goal of developing their parenting skills. Mother had completed a parenting program at the time of the goal change hearing. However, Gregory testified that she did not demonstrate appropriate parenting skills during supervised visits with Children. Mother and Father would both question Be.V. during visits about why she did not want to talk to them or why she did not love them anymore, which made her uncomfortable. She would be unable to sleep the nights before and after her visits and would get stomach aches and panic attacks.

Be.V. refused to attend visits for approximately three months. When she refused visits, there were incidents when Mother and Father would follow Be.V. around the public pool while she was there with her foster family. On one occasion, Mother followed Be.V. into the changing room and pulled the curtain back, exposing her to the room. Be.V. started having anxiety and

panic attacks when visiting the pool. Be.V. consistently told the caseworkers that she did not want to attend visits with her parents.

Gregory testified that Mother and Father separated and reconciled several times over the course of the case and both were currently married to other people. At the time of the goal change hearing, Mother and Father had resumed their relationship for approximately three months. At the prior review hearing in June 2020, they were ordered to attend either couples' counseling or co-parenting counseling. They attended a single couples' counseling session in October 2020.

Gregory said Be.V. wanted to be adopted by her current foster family. She was excelling academically in her foster home, had perfect attendance at school and attended therapy weekly.[3] Ju.V. had some behavioral issues while the case was pending, including stealing money and destroying his shoes and toys. On one occasion, he carried a sharp metal nail file in his pocket and said that he needed it to protect himself in case Mother and Father tried to kidnap him. He had nightmares about kidnapping and was attending therapy

---

[3] Be.V.'s therapist testified at the hearing and said that Be.V. had anxiety surrounding visits with Mother and Father and was distressed regarding the incidents at the pool. Mother participated in one therapy session with Be.V. but did not obtain a release from her own therapist to collaborate for further joint sessions with Be.V. Be.V. did not want to attend therapy with Mother and told her therapist that she did not believe her parents could change. She said she wanted to be adopted by her foster family so that she could have a stable home environment.

biweekly but was doing well in school. Jo.V. was in the Head Start program and was doing well with her foster family, but she would have attitude problems after visits with Mother and Father.

Bn.V. was also doing well in her foster home but would exhibit behaviors like fighting and biting after returning from visits with Mother and Father. Bn.V. had stopped biting others after adjusting to her foster home but the behavior resumed when she began visiting with Mother and Father. She was receiving speech therapy. Gregory testified that when Bn.V. was placed at 15 months old, she did not talk at all. At the time of the goal change hearing, she would only speak one word at a time.

Gregory testified that all of the Children were thriving in foster care with families who were willing to adopt them. Their foster families encouraged them to visit with each other. They had been in foster placement for 15 months at the time of the hearing. Gregory said that Mother and Father had minimally met the goals for reunification by completing anger management and parenting programs but were still unable to apply what they had learned in visits with Children. She did not believe they had benefited from counseling and mental health services.

Amber Everett (Everett) of JusticeWorks Youth Care testified regarding her work as Mother and Father's visiting coach and as Father's parent educator. From February through August 2020, she met with Mother and Father before and after supervised visits to discuss Children's needs and

review the visit. Mother struggled with engaging with Children during the visits and only interacted with them for short periods of time. She did not retain coaching information from prior visits and would consistently need improvement on the same goals. She focused her attention primarily on Be.V. When she stopped attending visits, Mother would ask about Be.V. instead of interacting with the other Children. She left one visit early because Be.V. did not attend and did not attend three visits when she knew Be.V. would not be there. When Be.V. did attend visits, Mother would ask her inappropriate questions about why she did not want to visit them.

Mother and Father would not ensure Children took bathroom breaks during the visits and would become frustrated with Bn.V. when she soiled herself as a result. When they visited with Children together, Mother would expect Father to perform most of the parenting tasks while she would work on crafts alone. Everett testified that Mother and Father both needed her assistance during the majority of the supervised visits and neither of them would use the parenting skills they had been taught without coaching.

Hannah Seigworth (Seigworth), a case aide at JusticeWorks Youth Care, supervised the visits that took place at Father's home beginning in September 2020. She testified that during one visit, Be.V. was excited about joining the cheerleading team and Mother responded by quoting from a movie and saying, "cheerleading is for retards." Notes of Testimony, 10/20/2020, at 167. Mother and Father would argue and yell at most visits and did not supervise

Children closely. Children would run into other rooms or outside of the yard and Seigworth would have to direct Mother and Father to locate them. Based on her observations at the home visits, she believed it would be a safety risk for Mother and Father to have unsupervised visitation with Children. She did not see any progress in their parenting skills over the nine supervised visits she conducted at Father's home.

Be.V. testified that she was happy in her foster home and wanted to remain there. She said that she does not like visiting with Mother and Father and that Father yells at her during the visits. She said that Children did not get enough attention when they lived with Mother and Father and that she had to act like a mother to her younger siblings. She said that when they lived with Father's relative, Mother and Father would leave for weeks at a time and they would not know when they would be coming back. She believed that if Children were returned to Mother and Father that they would be returned to foster care within five months. She said that Mother and Father had not changed and that she wanted to stop visiting with them and be adopted.

At the conclusion of the hearing, the trial court changed the permanency goal for Children from reunification to adoption and ordered that they have no further visitation with Mother and Father. CYS subsequently filed petitions to terminate Mother's parental rights.

**B.**

Gregory testified again at the termination hearing held on January 19, 2021. Children had been in placement for 18 months. Since visitation with Mother and Father had ceased, Be.V. no longer had stomach aches, panic attacks or trouble sleeping. She had been less depressed and anxious and had decreased her therapy sessions from weekly to monthly. Ju.V. was no longer afraid of being kidnapped by Mother and Father. He had moved to a new foster home and adjusted well without behavioral problems. He attended weekly therapy. Jo.V. had no behavioral issues in her foster home. She referred to her foster parents as mom and dad and her foster siblings as her brother and sisters. Bn.V. had only two instances of biting since visitation ceased when she would normally bite for a couple of days after each visit. She had continued with weekly speech therapy. Children's foster parents were all able to adopt Children and they had weekly visits with each other.

Gregory testified that Mother and Father did not make any additional progress on their reunification goals after the goal change hearing. They attended four additional couples' counseling sessions but were still fighting with each other. Mother had maintained her residence and continued to receive SSI payments. She stopped working at Subway after the goal change hearing. She had been inconsistent with her mental health counseling and had not attended a session in approximately one month.

Mother and Father had not had contact with Children since the hearing. Gregory reported incidents where they parked outside of Be.V.'s foster home

and only left when CYS threatened to call the police. They also followed Be.V. around on Halloween when she was trick-or-treating, which made her feel unsafe. Gregory concluded that Mother and Father had not made sufficient progress on any of their goals and recommended termination of their parental rights. She did not believe termination would have a negative effect on Children and said that it would be in their best interests to remain with their foster families.

Mother also testified at the termination hearing. She said that she attended counseling every week by video-chat but had missed some recent sessions. She had remained current on her medication. She said that she had beds and clothes for Children at her home but CYS had not inspected her residence since the goal change hearing. She and Father were not in a romantic relationship but had continued couples' counseling. She testified that she left her job at Subway because she could only work 25 hours per week without losing her benefits. She said that Children always showed affection during past visits and were happy to see her, but that Be.V. had mixed emotions about visiting. She said that she only parked outside of Be.V.'s foster home when she was visiting an office nearby and only approached her on Halloween to say hello and take a picture. She did not want her parental rights to be terminated and believed that it would not be in Children's best interests.

Tina Morgan (Morgan), a parent educator from the Jefferson-Clarion Early Head Start program, testified that she had weekly visits with Father beginning in July 2019 to work on educational, nutritional, health and parenting skills. Morgan said that Mother attended approximately ten of the visits when she was working with Father but she did not work with Mother on a weekly basis. She did not believe that they co-parented well but said that with counseling, they may be able to learn. She worked with Father over the phone until November 2020 but she stopped attending visits in March 2020 due to the pandemic.

Father testified that he had maintained his apartment for over a year, had three bedrooms and was current on rent and utilities. He said that his guns had trigger locks and he had two locks on the closet where they are stored. He had worked at his cleaning job for approximately seven years and earned $11 per hour. He completed an anger management course in 2020 and continued to see his counselor every other week. He stopped participating in parenting classes after the goal change hearing but said that the visits with Children went well prior to the goal change. He attends couples' counseling every other week with Mother. He did not want his parental rights to be terminated and requested the Children be returned to him.

Following reception of the evidence, the trial court granted the petitions to terminate Mother's parental rights.[4] Mother filed timely notices of appeal and she and the trial court have complied with Pa.R.A.P. 1925. On appeal, Mother argues that the trial court abused its discretion in terminating her parental rights to Children pursuant to subsections 2511(a)(1), (2) and (5) of the Adoption Act and in failing to address Children's best interests under Section 2511(b) in the order terminating her parental rights or its subsequent opinion.

## II.

### A.

"The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]." *In re Adoption of J.N.M.,* 177 A.3d 937, 942 (Pa. Super. 2018) (quoting *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007)). Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted). The court may then enter a final

---

[4] The trial court granted the petitions orally on the record at the conclusion of the hearing and the written orders were docketed on January 26, 2021.

decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b). *Id.*[5]

The trial court found clear and convincing evidence to terminate Mother's parental rights pursuant to subsections 2511(a)(1), (2) and (5). When reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm the order. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we proceed to our analysis of the trial court's findings under subsection 2511(a)(2):

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

[5] We review such a decree for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *In re Interest of D.F.,* 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.*

23 Pa.C.S. § 2511(a)(2). Under Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). The grounds for termination of parental rights under subsection 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

Because subsection (a)(2) focuses on the child's need for essential parental care, control or subsistence, a parent's sincere efforts to perform parental duties may be insufficient to remedy parental incapacity. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). "[W]hen a parent has demonstrated a continued inability to conduct his . . . life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." *Id.* at 1118 (citation omitted).

Mother argues that she did not refuse to provide parental care and was not incapable of doing so because she completed her parenting classes, began therapy for her mental health, obtained stable housing and excluded inappropriate individuals from living with her, attended regular supervised visits with Children and attended a session of Be.V.'s counseling. She argues that these efforts represent substantial progress toward the goals set forth in

her family services plan and show that she was actively trying to provide care and control for Children. Her arguments are belied by the record.

Mother had been receiving services for over a decade to help her develop parenting skills, obtain stable housing, address her mental health and remedy the domestic violence and instability in her relationship with Father. While she did take steps to address her mental health, she had not attended counseling consistently throughout the pendency of the dependency action and had not attended in nearly a month before the termination hearing. She did not obtain a blended case manager to help her manage her care. She did have her own residence from January 2020 onward, but on several occasions, she allowed inappropriate adults to stay in the home and did not report their presence to CYS. She allowed individuals with criminal convictions for crimes against children and indicated perpetrators of abuse into her home. Her relationship with Father was unstable and domestic violence and fighting remained a concern.

Mother completed a full course in parenting skills by the time of the goal change hearing and at one point the family received 23 hours per week of in-home services, which was far above what an average family would receive during a dependency case. Despite these extensive services, Gregory and Seigworth both testified that Mother would not apply the parenting skills she had learned and consistently needed the same coaching at every supervised visit. Mother would only minimally engage with Children during the visits and

would spend most of her time on her phone or working on crafts alone. Seigworth opined that it would be unsafe to leave Children in an unsupervised environment with Mother because she was incapable of caring for them and addressing their needs without prompting from a service provider. This assessment was corroborated by testimony from Peters and Myers, who both said that when Children were still living with Mother and Father, they were frequently dirty and did not have shoes or other supplies. Further, Mother was indicated as a perpetrator of medical abuse and neglect because she did not administer prescribed medication to Jo.V. and Ju.V.

At supervised visits, Mother would repeatedly ask Be.V. inappropriate questions such as why Be.V. did not want to see her or love her anymore. Mother followed Be.V. when she was at the pool with her foster family, parked outside her foster home and approached her on Halloween, making her feel unsafe. Be.V. testified that when she did live with Mother, she had to fulfill the parental role for her younger siblings. She preferred her foster home because she was given attention and support that she had never experienced when living with Mother and Father.

Because subsection 2511(a)(2) focuses on the child's need for "essential parental care, control or subsistence necessary for his physical or mental well-being," even a parent's sincere efforts at providing parental care can be insufficient to remedy the parent's incapacity if those efforts are not likely to be successful in providing the child with essential parental care. ***In re Z.P.***,

*supra*. Here, the record supports the trial court's determination that Mother has refused or been incapable of providing Children with essential parental care throughout their lives, and that despite extensive services provided in Armstrong and Clarion counties, she has been unable to remedy her incapacity. She made minimal progress at achieving the goals in her family service plan and she was unable to develop the skills necessary to provide Children with essential parental care. The trial court did not abuse its discretion in finding that CYS provided clear and convincing evidence that Mother either refused to or was incapable of providing Children with such care. Mother's first claim is meritless.

**B.**

Next, Mother argues that the trial court abused its discretion by failing to consider whether termination was in Children's best interests under Section 2511(b). Appellees contend that Mother waived this issue by failing to include it in her concise statement pursuant to Pa.R.A.P. 1925(b). *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); *In re G.D.*, 61 A.3d 1031, 1036 n.3 (Pa. Super. 2013). Our review of the record confirms that Mother did not include this issue in her concise statement. Accordingly, it is waived.

Even if we were to reach the merits of this claim, we would conclude that the trial court did not abuse its discretion in holding that termination was in Children's best interests.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. . . .  While a parent's emotional bond with his or her child is a major aspect of . . . [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015).  "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship."  *In re Z.P.*, *supra*.  The court may also consider intangibles such as the love, comfort, security and stability the child might have with the foster parent.  *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

While it did not specifically cite Section 2511(b) in the written order, the trial court stated on the record at the conclusion of the termination hearing that Children were "better off in their foster homes and their pre-adoptive homes."  Notes of Testimony, 1/19/21, at 95.  In its opinion, the trial court explained that there was no evidence in the record of a bond between Children and Mother.  Trial Court Opinion, 3/11/21, at unnumbered 7.  The lack of bond was evident in Be.V.'s testimony when she explained that she did not feel that Mother and Father had changed at all over the course of dependency and said

- 22 -

that she wanted to be adopted. She believed that if Children were returned to Mother and Father's care, they would reenter foster care within five months. The evidence at the termination hearing showed that Children were thriving in their foster homes and were no longer experiencing anxiety, depression, fear or behavioral problems after they ceased visitation with Mother and Father. The record amply supports the trial court's determination that termination of Mother's parental rights would serve Children's best interests.

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/1/2021